UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

EDISON ALEXANDER PEOPLES #479867,

        Plaintiff,

    v.

CATHERINE BAUMAN, et al.,

        Defendants.

_____/

Case No. 2:14-cv-106

Hon. Gordon J. Quist
U.S. District Judge

## **REPORT AND RECOMMENDATION**

### I.  Introduction

State prisoner Edison Alexander Peoples filed this civil rights action, pursuant to 42 U.S.C. § 1983, on May 14, 2014.   (ECF No. 1.)   He amended his complaint on October 24, 2014.   (ECF No. 10.)

Peoples's claims relate to events that took place at the Alger Correctional Facility (LMF) in May, June, and August of 2011, when he was removed from his cell and restrained on several occasions.

U.S. District Judge R. Allan Edgar entered orders and judgments dismissing parts of the case in 2014, 2015 and 2016.   (ECF Nos. 8, 9, 45, 118, 119.)   The case was closed on May 20, 2016.   Peoples appealed.

On September 5, 2017, the Sixth Circuit vacated, in part, the District Court's dismissal of this case and remanded for further proceedings.   (ECF No. 130; *Peoples v. Bauman*, No. 16-2096, 2017 WL 7050280 (6th Cir. Sept. 5, 2017).)   The Order of

the Court of Appeals included directions to the District Court to consider specific allegations made by Peoples.   Those instructions will be covered below.

Peoples's remaining claims involve Eighth Amendment and state law tort violations.

Defendants remaining in the case are: (1) Warden Catherine Bauman, (2) Deputy Warden Scott Sprader, (3) Deputy Warden Dan Lesatz, (4) Assistant Resident Unit Supervisor Victoria Hood, (5) Captain Immel, (6) Lieutenat O'Dell, (7) Lieutenant Hursh, (8) Sergeant Lee, (9) Sergeant Kienitz, (10) Corrections Officer (CO) Johnson, (11) CO Sadak, (12) CO Tennyson, (13) CO Wickstrom, (14) CO McDonnald, (15) Nurse Scott, (16) Captain Taskila, (17) Captain Smith, (18) CO Curtis, (19) Sergeant Rankin, (20) Sergeant Rondeau (22) Resident Unit Manager Lindenmuth[1], and (23) CO Branus (who is unserved).

The first incident at issue in this case began on June 13, 2011, after Peoples's housing unit flooded.   Defendants believe that Peoples flooded his cell.   Peoples

---

[1]      Whether Curtis, Rankin, Rondeau, and Lindenmuth remain Defendants after the Sixth Circuit remanded this case is in dispute.   The Defendants did not list them as remaining Defendants, and Peoples has not listed the remaining Defendants in his pleadings.   (ECF No. 214-2, PageID.1428.)   The Sixth Circuit determined that claims against Curtis, Rankin, Rondeau, and Lindenmuth were not exhausted by Peoples in his administrative grievance discussing the August 8 incident.   (ECF No. 130, PageID.1015.)   Peoples made allegations against Defendant Curtis leading up to and after his cell extraction during the June incident, and against Rankin and Rondeau after he was restrained while inside his cell.   Peoples made allegations against Defendant Lindenmuth involving the return of his mattress before the June incident.   This recommendation will consider Defendants Curtis, Rankin, Rondeau, and Lindenmuth as remaining Defendants for their involvement during events surrounding the June cell extraction.

says that he did not flood his cell and that another prisoner in his unit caused flooding that seeped into his cell.   Regardless of the cause of the flooding, Corrections Officers ordered Peoples out of his cell and he refused.   Based on that refusal, Officers formed a cell extraction team and were prepared to use chemical agent to force Peoples to comply.   However, before chemical agent was needed, Peoples decided to comply with orders.   Peoples was placed in hard restraints.   The restraints consisted of handcuffs and leg irons that were connected to a belly chain.   Peoples says that he was required to lie in the "sewage water" while Officers outside his cell applied the restraints through the cell door slots.   Peoples alleges that his clothes were saturated with sewage water.   The removal of Peoples from his cell and his restraint using hard restraints was video-taped.[2]

Peoples says that he was subsequently secured in an uncomfortable and painful crouching position and remained in restraints for 31-½ hours.

The second incident began on August 8, 2011.   Peoples barricaded himself in his cell by placing paper over his door window and moving his mattress in front of his door. Peoples was removed from his cell with the aid of a chemical agent and remained in soft restraints in a crouching position until August 11, 2011.   This removal was also video-taped.[3]   Plaintiff states that his skin burned from the chemicals and he was unable to pull his pants down to relieve himself.   Peoples says

---

[2]      This recording is sealed.   (ECF No. 231.)

[3]      This recording is also sealed.   (*Id*.)

that he was not allowed to clean the chemical agent residue off his body until August 18, 2011.

Defendants have moved for summary judgment.

The undersigned concludes that the video recordings, medical records, Unit Logbooks, Peoples's own statements, affidavits, and information on the chemical agent used in this case demonstrate that no genuine issue of material fact exists in this case and Defendants are entitled to summary judgment.   Thus, I respectfully recommend that the Court grant Defendants' motion for summary judgment and dismiss this case.[4]

## II.   Procedural History

As noted in the Introduction, Peoples filed his original complaint on May 14, 2014.   (ECF No. 1.)   Peoples filed an amended complaint on October 24, 2014. (ECF No. 10.)

Judgment was entered dismissing this case on May 20, 2016.   On September 5, 2017, the Sixth Circuit vacated, in part, this Court's opinion dismissing this case and remanded for further proceedings.   (ECF No. 130; *Peoples v. Bauman*, No. 16-2096, 2017 WL 7050280 (6th Cir. Sept. 5, 2017).)   In addition to vacating the dismissal of People's claims arising out of the incidents which occurred on June 13, 2011, and August 8, 2011, the Sixth Circuit directed this Court to consider these allegations:

---

[4]      A separate order will issue on the motion for show cause.

1) After the second incident, Defendants Hood, Taskila, Smith, Immel, O'Dell, Lee, Johnson, and Branus each visited Plaintiff's cell during the time he was in restraints.  Peoples informed each of them that he was in pain and was suffering due to the "mace" and restraints. The Sixth Circuit held that Peoples stated a claim against each of these Defendants because they "personally witness[ed] the alleged abuse" and at "least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." (ECF No. 130, PageID.1013-1014.)

2) Defendants Bauman, Lesatz, and Sprader denied him a mattress and other bedding at times during which it was very cold. (PageID.1014.)

3) Defendants Bauman, Lesatz, and Sprader were aware through "various prison documents, of a history at LMF of using restraints and mace as a means to inflict punishment . . . ."  (*Id.*)

4) Peoples had told Defendant Hursh about his pain and suffering following the August 8, 2011, incident. (*Id.*)

5) Defendant Nurse Scott failed to ensure that Peoples had cleaned the mace off his person and clothing after the August 8, 2011, incident. (*Id.*)

In addition, the Sixth Circuit noted that it would be the task of the District Court to determine which type of Eighth Amendment framework is applicable to each of the many factual allegations.   The Court stated:

> Though Peoples's allegations implicated multiple Eighth Amendment claims, the district court evaluated his restraints claim under only an excessive-force standard and his mace claim under only a deliberate-indifference-to-his-serious-medical-needs standard. And the district court addressed Peoples's restraint and mace claims in isolation, thus failing to consider the combined negative impact of the two.

(*Id.*, PageID.1017.)

The Court noted that there "may be some overlap between People's excessive-force and conditions-of-confinement claims."   (*Id.*)   Lastly, the Court of Appeals directed the district Court to consider Peoples's claims relating to his "inhumane" and "hazardous living conditions"— challenges to his conditions of confinement.   (*Id.*, PageID.1017.)[5]

Defendant's filed their more recent motion for summary judgment on March 21, 2019.   (ECF Nos. 213, 214, 216.)   Peoples filed his response on May 6, 2019.   (ECF No. 232.)   His response included objections to some of Defendants' exhibits.   Defendants replied on May 13, 2019.   (ECF No. 234.)

---

[5]    The Sixth Circuit dismissed the claim against Defendant Hursh arising out his involvement as the hearing officer for the misconduct ticket hearing on June 21, 2011. This effectively dismissed Plaintiff's claims arising on June 21, 2011, against Defendant Hursh.   Plaintiff's Eighth Amendment deliberate-indifference-to-his-serious-medical-need claims were dismissed.   Defendants Lindenmuth, Rankin, Rondeau, and Curtis were dismissed from the claims arising out the August 8, 2011, incident due to Plaintiff's failure to exhaust his administrative remedies.

On May 17, 2019, this Court heard oral argument on Defendants' motion for summary judgment.   During the hearing, Peoples acknowledged that the use of chemical agent during the removal on August 8, 2011 was justified.[6]   But, he asserted that Defendants' actions afterwards violated his rights.   Following the hearing, and pursuant to Fed. R. Civ. P. 56(e)(1), the Court entered an order allowing Defendants to authenticate assertions of fact to which Peoples objected or explain how those facts would be admissible in evidence. (ECF No. 238, PageID.1723.)   The Court also authorized both parties to file supplemental briefs on or before June 24, 2019.   (*Id*.)

Defendants filed their supplemental brief on June 11, 2019 (ECF No. 239, PageID.1724), and Peoples filed his supplemental brief on July 2, 2019[7] (ECF No. 242, PageID.1742).

### III. Plaintiff's allegations

Peoples is currently housed at the Ionia Correctional Facility, in Ionia, Michigan.   The events that Peoples describes in his complaint occurred at the Alger Correctional Facility, in Munising, Michigan.[8]   (ECF No. 10.)   Peoples says that he

---

[6]   Oral argument was recorded.   Peoples made this concession approximately 57 minutes into the hearing.

[7]   This brief is post-marked June 29, 2019.   (ECF No. 242, PageID.1749.)

[8]   At time of alleged events, summer of 2011, Peoples was being held at a security level IV.   In the MDOC, security classifications, from least to most secure, are as follows:   Levels I, II, IV, V, and administrative segregation.   MDOC Policy Directive 05.01.130 ¶ B (Oct. 10, 2011).

was placed in a segregation cell during May of 2011, due to engaging in threatening behavior. (*Id.*, PageID.161.) On May 30, 2011, Peoples's mattress was removed from his cell because he had used it to block his cell door. (*Id.*) Peoples says that on June 13, 2011, Defendant Corrections Officer Curtis came to his cell with a mattress, opened the food slot, and told him that he needed to beg for it, or he would not receive the mattress. (*Id.*) Peoples put his arm through the food slot and refused to remove it until he could speak with one of Curtis's superiors. (*Id.*) Defendant Lindenmuth arrived at the cell, and Peoples informed him about Defendant Curtis's behavior. (*Id.*, PageID.162.) Peoples says that Lindenmuth explained that his allegations were not serious enough to take corrective action against Curtis. Peoples says that he then removed his arm from the food slot, and Lindenmuth ordered Curtis and Officer Boyak to place the mattress in Peoples cell. (*Id.*) Peoples was handcuffed, the mattress was placed in his cell, then the Officers removed the handcuffs and closed the food slot without further incident. (*Id.*)

Peoples says that he discovered that the mattress was damaged and had several holes in the covering. (*Id.*) Peoples says that Officer Boyak later refused to serve him a food tray. (*Id.*) Peoples says that when Boyak came back to pick up food trays that he had delivered to other prisoners, one prisoner threw a mixture of urine and feces at Boyak which landed in front of Peoples's cell. (*Id.*, PageID.163.) After Boyak left the prison wing, large of amounts of sewage carrying urine, feces and "other bio-hazardous material" began to flood the wing and enter into Peoples's cell. (*Id.*)

Defendant Curtis came to Peoples's cell to inform him that an Emergency Response Team (ERT) was arriving to place him in restraints. (*Id.*) Several Officers arrived outside the cell, with a video camera, and ordered Peoples to remove and pass his clothing through the cell door food slot. (*Id.*) Peoples says that he asked to speak to a superior officer. (*Id.*) Peoples says that he was then told that a chemical agent would be released into his cell if he failed to comply with orders. (*Id.*) Peoples says that he removed his clothing and complied with the Officer's orders. (*Id.*) He was then subjected to a visual cavity search. (*Id.*, PageID.164.) The Officers returned the clothing, except for his shoes and socks. (*Id.*) Peoples says that he dressed. (*Id.*)

One of the Officers ordered Peoples to sit on the floor and place both legs through the cell door lower food slot. (*Id.*) Peoples says he protested because there was sewage and human waste was on the floor. (*Id.*) Peoples says that he complied with the order and saturated his pants, underwear, and shirt in the sewage. Restraints were placed on his legs. (*Id.*) After he stood up, restraints were placed on his arms. (*Id.*) Peoples says that a belly chain was tightened around his waist and locked at his back. (*Id.*)

Peoples says that he was ordered to bend his knees approximately 18 inches and he was secured in a permanent crouching position. (*Id.*, PageID.165.) Peoples then walked backwards to the shower stall, while Officers entered his cell and removed his mattress and placed all his property into a locked footlocker. (*Id.*) Peoples says that the Officers tightened his belly chain and he was walked backward

into his cell and the door was closed while he remained in restraints.   (*Id*.)   Peoples says he suffered in excruciating pain, had decreased mobility, and could not touch his face or lower his pants below his waist.   (*Id*.)   In addition, Peoples discovered that the water had been turned off in his cell.   (*Id*., PageID.166.)

Defendant Sergeant Rankin informed Peoples that he had issued Peoples a misconduct ticket for refusing orders to remove his arm from the cell slot earlier that day.   (*Id*.)   Peoples says he complained about the restraints, denial of bedding, the lack water, his wet clothing, the room temperature, and that he was unable to pull down his pants to relieve his bowels or to urinate.   (*Id*.)   According to Peoples, Sergeant Rankin walked away without explaining why Peoples was in restraints. (*Id*.)

Later that day, Peoples told Defendant Sergeant Rondeau about his cell conditions, including the denial of bedding, running water, and the fact that his clothing was covered in raw sewage, that he did not have shoes or socks, and that the temperature was cold and his restraints were too tight.   (*Id*.)   Peoples says that Defendant Rondeau responded by stating "he didn't care" and he handed Peoples a misconduct report charging him with destruction or misuse of property before leaving the unit.   (*Id*.)   Then on June 13, 2011, Defendant Curtis wrote Peoples a misconduct report stating that the mattress had been altered after discovering the holes in the mattress.   (*Id*.)

Peoples says that it became cold at night, and that he was forced to urinate and defecate on himself.   (*Id*., PageID.167.)   He remained in restraints under these

- 10 -

conditions for approximately 30-½ hours.  (*Id.*)  Peoples says that he continued to complain to whoever came to his cell door until his restraints were removed without explanation on June 15, 2011.  (*Id.*, PageID.169.)

Peoples says that on June 16, 2011, his footlocker was unlocked providing access to his personal property and his water was turned on.  (*Id.*)  Peoples says that he had to wait several days before he received cleaning or laundry services. (*Id.*)

On June 21, 2011, Peoples was found guilty of the misconduct ticket for misusing or destruction of property and received 30 days loss of privileges and was ordered to pay $48.33 in restitution.  (*Id.*)  Peoples says that he received a mattress on June 27, 2011.  On July 21, 2011, Peoples's mattress was confiscated because it had been damaged.  (*Id.*, PageID.171.)  Peoples was given a wool blanket as a substitute.  (*Id.*)  The mattress was returned on August 1, 2011.  (*Id.*)

Peoples says that on August 8, 2011, Officer Kurth refused to serve him a meal. (*Id.*)  As a result, Peoples "barricaded himself in his cell." (*Id.*)  Defendants Kienitz, Tennyson, Wickstrom, Sadak, and McDonnald, wearing "full riot gear," arrived at the cell with a video camera.  (*Id.*) Defendant Sadak ordered Peoples to remove the barricade from the door.  (*Id.*)  Peoples says that he refused the order.  (*Id.*)  The Defendants then used a device to push the barricade from the door and sprayed a chemical agent into the cell.  (*Id.*)  Peoples says that the he was standing only three feet from the door and entire burst of chemical agent struck him directly in the face, chest, and body saturating his clothing.  (*Id.*, PageID.172.)  Peoples admits that the

chemical agent was effective, because he says he surrendered within one minute and removed the remaining barricade from the door.   (*Id.*)

Defendant Sadak ordered Peoples to remove and pass his clothing through the food slot.   (*Id.*)   Once Peoples was unclothed, he says that his entire body was exposed to the chemical agent that remained inside his cell.   (*Id.*)   A visual body cavity search was conducted causing the chemical agent to spread to sensitive parts of his body.   (*Id.*)   Peoples was then restrained in the same manner as the previous restraint.   (*Id.*)   Once he was in restraints, he was escorted out his cell and forced to walk backwards until he was outside of the housing unit.   (*Id.*, PageID.173.)   Outside, Defendant nurse Scott placed eye-drops into each of Peoples eyes. (*Id.*) Peoples says that the eye-drops had no effect on the "intense burning" that he was experiencing.   (*Id.*)

Peoples says that his clothes were "saturated with chemical agent and that his body was 'burning' intensely." (*Id.*)      Peoples says that he repeatedly asked Defendants Kienitz, Sadak, Tennyson, Wickstrom, McDonnald, and Scott to permit him to take a shower to wash the chemical agent off his body.   (*Id.*)   After about five minutes outside in the fresh air, Defendant nurse Scott advised the Officers to return Peoples to his cell.   (*Id.*)   Once inside, Peoples says the restraints were tightened before he was taken to a new cell.   (*Id.*)   Peoples says that he was again refused a shower.   (*Id.*)   Peoples says that he was shoved into the new cell.   (*Id.*)

Peoples says that the restraints decreased his range of motion and his mobility in his arms and legs, and made it impossible to touch his face, or to lower his pants.

(*Id.*, PageID.174.)   Peoples says that he was unable to clean the chemical agent off his body or remove his clothing while restrained.   (*Id.*)   The chemical agent, over the next five days, caused Peoples to breathe with difficulty, burned his eyes, lungs, genitals, and buttocks and he feared death would result.   (*Id.*)   Peoples alleges that he was unable to wash the chemical agent off his body until ten days had passed. (*Id.*)   He further alleges that he was denied a mattress and bedding, and after several hours in restraints he was forced to urinate and defecate on himself.   (*Id.*) Peoples says that his cell was poorly ventilated, small, and unbearably cold at night. (*Id.*)

Peoples says that after he was restrained and placed in the new cell, Defendant Taskila visited him.   (*Id.*)   Peoples told Defendant Taskila about his cell conditions, including his exposure to a chemical agent and inadequate decontamination, being in too tight restraints, the denial of bedding, shoes, socks, the cold temperatures, and his inability to pull down his pants to urinate or relieve his bowels.   (*Id.*)   Peoples says that Defendant Taskila did nothing.   (*Id.*)

Peoples says that on August 9, 2011, he told Defendants Taskila, Smith, Lee, Hursh, Hood, Johnson, and Branus, who each visited Peoples separately during the day, about these concerns.   Peoples says that none of them took corrective action. (*Id.*, PageID.175-176.)   Peoples admits that he did receive a wool blanket on August 9, 2011.   (*Id.*, PageID.176.)

Peoples says that on August 10, 2011, Defendants Taskila, Lee, Hursh, O'Dell, and Hood each visited Peoples separately during the day. (*Id.*) Peoples says that he again expressed his concerns and says each Defendant did nothing. (*Id.*)

Peoples says that on August 11, 2011, Defendants Immel and Hood separately visited Peoples. (*Id.*) Once again, Peoples expressed concerns about the tightness of his restraints and his conditions of confinement. (*Id.*, PageID.176-177.) Peoples says that nothing was done to alleviate his concerns. (*Id.*, PageID.177.) That day, Peoples's restraints were removed. (*Id.*) Peoples says that he did nothing that could have warranted his restraint between August 8 and 11, 2011. (*Id.*)

On August 13, 2011, Peoples received new clothing and, on August 18, 2011, he was given his personal property and hygiene items. (*Id.*) Peoples says that this was the first time he was able to wash the chemical agent off his body. (*Id.*) On August 19, 2011, Peoples was given a mattress. (*Id.*)

Peoples alleges that Defendants Lesatz, Sprader, and Bauman were responsible for placing him on a mattress restriction and for educating and training staff. (*Id.* PageID.177-178.) Peoples complains that Defendants Lesatz, Sprader, Bauman, Taskila, Smith, Lee, Hursh, Hood, Johnson, O'Dell, and Immel were aware from "critical incident reports, . . . video footage, . . . prisoner grievances, . . . staff complaints, . . ., other similar documents, . . ., and personal observation" that restraints, chemical agents, and other forms of restrictive conditions of confinement were used for punishment and not for legitimate penological purposes. (*Id.*, PageID.178-179.)

## IV.   Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## V.   Eighth Amendment Standard

The Sixth Circuit set forth the standard for Eighth Amendment excessive force claims and conditions of confinement claims in its 2017 Order in this case:

> *Excessive Force*
>
> "The Eighth Amendment proscribes the unnecessary and wanton infliction of pain against prisoners." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). An Eighth Amendment claim consists of both subjective and objective components. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014). In the excessive-force context, the subjective component turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). "The objective component requires the pain inflicted to be 'sufficiently serious.'" *Williams*, 631 F.3d at 383 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Peoples alleged that he was confined in a painful crouching position from the restraints for about three days. Also, he claimed the "complete denial of bedding [and] shoes and socks" during this time period in an allegedly cold cell. And he alleged that he experienced intense burning from the mace, and was not permitted to wash it from his body for about ten days. Under circumstances similar to this case, courts have determined that the continued use of restraints and the failure to permit a prisoner to wash off mace can support a showing of excessive use of force. *See Danley v. Allen*, 540 F.3d 1298, 1308 (11th Cir. 2008) ("Although less common than the direct application of force, subjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions—here, the pepper spray lingering in the air and on him—can constitute excessive force."); *Williams v. Benjamin*, 77 F.3d 756, 765 (4th Cir. 1996) (prisoner was shackled and was not permitted to wash off mace for eight hours); *Harris v. Jones*, No. 10-1580 (6th Cir. Dec. 9, 2010) (unpublished). We make no ultimate determination whether Peoples's allegations here constitute excessive force. However, we remand so that the district court may do so, considering the combined negative impact of all of Peoples's allegations.

## Conditions of Confinement

The Eighth Amendment requires prison officials to provide humane conditions of confinement. *Farmer*, 511 U.S. at 832. "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care." *Id.* A conditions-of-confinement claim has two elements: (1) the deprivation alleged must be sufficiently serious under an objective standard of review; and (2) the prison official's "state of mind [must be] one of 'deliberate indifference' to inmate health or safety." *Id.* at 834. "To move beyond the pleading stage . . . an inmate must allege that he has been deprived 'of the minimal civilized measure of life's necessities.'" *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

Parsing out what type of Eighth Amendment framework each of the many factual allegations in this case falls under is undoubtedly a laborious undertaking. *See Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 569-70 (6th Cir. 2013). There may be some overlap between Peoples's excessive-force and conditions-of-confinement claims. Here though, Peoples's allegations, including the denial of bedding, shoes, socks, uncontaminated clothing, and the ability to use a toilet for days, warrant such an analysis by the district court on remand. The district court is best suited for this task, rather than this court for the first time

- 16 -

on appeal. Accordingly, we remand with instructions for the district court to consider all of Peoples's allegations connected with the August 8, 2011 incident in light of the appropriate constitutional framework, including whether he sufficiently alleged a conditions-of-confinement claim. However, the district court need not review Peoples's medical-needs claim on remand because, as discussed below, we conclude that the district court correctly dismissed it.

(ECF No. 130, PageID.1018-1019.)

Peoples's claim involving the use of restraints and chemical agents must be analyzed under the Supreme Court authority limiting the use of force against prisoners. This analysis must be made in the context of the constant admonitions by the Supreme Court regarding the deference that courts must accord to prison or jail officials as they attempt to maintain order and discipline within dangerous institutional settings. *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986).

Generally, restrictions and even harsh conditions of confinement are not necessarily cruel and unusual punishment prohibited by the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337 (1981). The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley*, 475 U.S. 312, should be applied. *Hudson*, 503 U.S. at 7; *see also Wilkins v. Gaddy,* 559 U.S. 34, 37-39 (2010). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7; *Wilkins*, 559 U.S. at 37. In determining whether the use of force is wanton and unnecessary, the court should evaluate: (1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat "reasonably perceived by the responsible

officials," (4) and any efforts made to temper the severity of the forceful response. *Hudson*, 503 U.S. at 6-7 (citing *Whitley*, 475 U.S. at 321); *Griffin v. Hardrick*, 604 F.3d 949, 953-54 (6th Cir. 2010); *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990). Physical restraints are constitutionally permissible where there is penological justification for their use.    *Rhodes*, 452 U.S. at 346.

In numerous cases, the Sixth Circuit has held that restraints were penologically justified where in light of the inmate's disruptive behavior, the inmate continued to pose a threat.    *Hayes v. Toombs*, No. 91-890, 1994 WL 28606, at * 1 (6th Cir. Feb. 1, 1994) (significant threat of further destructive behavior justified application of top-of-bed restraints against inmate); *Harris v. Ohio Dep't of Rehab. & Corr.*, No. 91-3920, 1992 WL 56999, at *2 (6th Cir. Mar. 24, 1992) (requiring inmate to wear restraint belt during visits was penologically justified); *Boswell v. Vidor*, No. 89-2372, 1990 WL 143501, at *1 (6th Cir. Oct. 2, 1990) (placing inmate in full restraints for twelve hours was justified where inmate had disobeyed a direct order by repeatedly refusing to return plastic gloves given to him for cleaning his cell); *Syncate-El v. Toombs*, No. 92-1421, 1992 WL 301270, at *2 (6th Cir. Oct. 21, 1992) (use of body chains during non-contact visits was justified in light of significant threat of further assaultive behavior given inmate's history of disruptive behavior); *Rivers v. Pitcher*, No. 95-1167, 1995 WL 603313, at *2 (6th Cir. Oct. 12, 1995) (top-of-bed restraints were appropriate even after inmate discontinued his earlier abusive, disruptive, and threatening behavior).

Temporary inconveniences, such as being subjected to a flooded cell, or deprived of a working toilet, do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006) ("[M]inor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim." (internal citation omitted)); *Hartsfield v. Vidor,* 199 F.3d 305, 310 (6th Cir. 1999) (stating that "deprivations of fresh water and access to the toilet for a 20-hour period, while harsh, were not cruel and unusual punishment") (citing *Stephens v. Carter Cnty. Jail*, 816 F.2d 682 (6th Cir.1987)); *Jones v. Toombs*, 77 F.3d 482 (6th Cir. 1996) (noting that denial of mattress and requiring inmate to sleep on the floor for up to four weeks does not violate the Eighth Amendment); *Rivers v. Pitcher*, 68 F.3d 3d 475 (6th Cir. 1995) (keeping a prisoner in top-of-bed restraints after barricading and flooding his cell, and refusing to obey orders even after use of a chemical agent was disbursed into his cell, failed to violate standards of excessive force or inhumane conditions of confinement under the Eighth Amendment).

The use of a chemical agent to control a disruptive prisoner and to restore order in the prison does not violate the Eighth Amendment. *Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014) (holding that the use of a chemical agent after a prisoner repeatedly refuses to obey orders does not violate the Eighth Amendment) (citing *Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004) (holding that a defendant's use of pepper spray on a prisoner who refused to leave the shower did not violate the

Eighth Amendment)); *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002) (noting "that the use of mace to control a prison inmate is not malicious or sadistic"); *Miller v. Palmer*, No. 99-2352, 2000 WL 1478357, at *2 (6th Cir. Sept. 27, 2000) (officers did not violate the Eighth Amendment when prisoner "refused to remove his arm from his food slot[,] refused to allow officers to place him in soft restraints[, and was] given several opportunities to comply with the officers' orders before chemical agents were used").

However, some deprivations in combination or not penologically justified may rise to an Eighth Amendment violation. In *Barker v. Goodrich*, 649 F.3d 428, 435 (6th Cir. 2011), the Sixth Circuit held that placing inmate in uncomfortable restraints for 12 hours, during which he missed one meal and did not have access to water or a toilet rose to the level of an Eighth Amendment violation. *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730 (2002) (finding an Eighth Amendment violation in the handcuffing of a prisoner to hitching post for seven hours in the hot sun without access to water).

## VI.   Analysis

Defendants argue that Peoples's escalating misbehavior required the use of hard restraints on June 13-14, 2011; the use of chemical agent on August 8, 2011; and the use of soft restraints from August 8 to August 11, 2011.[9]

The June and August incidents, as admitted by Peoples, were not the first incidents of misbehavior. A similar incident occurred on May 30, 2011. On that

---

[9]     As noted above, during oral argument, Peoples acknowledged that the use of chemical agent to effectuate the cell extractions on August 8, and the initial use of soft restraints after the cell extraction were justified.

date, Peoples covered his cell window with paper and refused orders to remove the paper.   Peoples told the Officers that he was holding his cellmate hostage, but when the Officers looked through the cell door food slot they observed Peoples and his cellmate sitting on the bed laughing.   Peoples was warned that a chemical agent would be used if he continued to refuse orders. Peoples failed to comply with the order and a chemical agent was sprayed into the cell.   Peoples was removed from his cell and placed in restraints.   Peoples received misconduct reports as a result of the May incident.   (ECF No. 214-3, PageID.1430-33.)

### 1.   The June 13, 2011 incident

About two weeks later, Peoples again refused to exit his cell when ordered.   At the time he was in a Level-4 segregation cell.[10]   Several of the Officers from the May 30 cell extraction were assigned to the move team on June 13.   (*See* ECF No. 214-3, PageID.1432 and 1435 (listing all Officers assigned to move teams).)

The video of the June 13, 2011 incident shows the removal of Peoples from his flooded cell.   During the video, the Lead Officer – Sgt. Suntare from the Birch Unit – said that Peoples had flooded his cell and was being disruptive during the day. Sgt. Suntare stated that Warden Bauman had authorized forced cell entry, chemical agents, and hard restraints.   Peoples was told that he was being extracted from his cell and a chemical agent was authorized.   Peoples is seen on the video yelling at the Officers.   Prior to use of chemical agents, Peoples protested, but eventually agreed to remove his clothes for a strip search.   After the strip search, Peoples was provided

---

[10]     Peoples noted the type of cell in which he was confined during oral argument.

clothing that was placed on the floor of his cell. After putting the clothing on, Peoples was placed in hard restraints and removed from his cell. Peoples was moved backward down the hall to a shower cell. Peoples was able to move in the restraints with limited restriction. When Peoples asked for the reason he was placed in restraints, an Officer told him that now was not the time for that question. The restraints were checked by a nurse, Peoples stayed in the hallway for a few minutes before he was taken back to the front of his cell. After his restraints were adjusted to require Peoples to slightly bend his knees, he walked into the cell. The video shows that while there was some water in the hallway outside of the cell, there was more water remaining inside the cell. Once inside the cell, Peoples remained standing at the door while looking through his cell window.

Peoples alleges that the restraints caused him discomfort, that his movement was restricted, and that the restraints prevented him from the using the toilet for over thirty hours in violation of his Eighth Amendment right to be free from excessive force and cruel conditions of confinement. Peoples says that he did nothing wrong and should not have been placed in restraints.

On June 13, 2011, Corrections Officer Dustin Boyak observed Peoples flood the wing of his unit "by what appeared to be water." (ECF No. 239-2, PageID.1736, affidavit of Dustin Boyak.) A move team was called to extract Peoples from his cell because he refused to remove his arm from the food slot in his cell door and because he was responsible for flooding the cell block. (*Id*.) Boyak attests that there was approximately 1-2 inches of standing water in the unit. (*Id*.) The standing water

did not contain feces or urine.[11]   (*Id.*)   The move team applied hard restraints, which slightly restricts movement, but allows the inmate to walk, sit, lay down, and use the restroom.   (*Id.*, PageID.1737.)   According to Officer Boyak, Peoples continued to harass and threaten staff after he was placed in restraints.   (*Id.*)

The relevant portion of a Critical Incident Report is attached:

**Prisoner Peoples 479867 was being disruptive by putting his arm out of his cell door upper slot, refusing to come out, and flooding the wing.  Warden Catherine Bauman was contacted and authorized forced cell entry, the use of chemical agent, and hard restraints (over two hours, if necessary) to control prisoner Peoples' destructive behavior.  Registered Nurse Phyllis Bergh was contacted and classified prisoner Peoples as normal risk for chemical agent.  At 1940 hours, a move team consisting of Acting Sergeant Charles Santure (Team Leader),  Resident Unit Officers Gary Schertz (Shield),  Chris Deatsman (Restraints), Joseph Perala (Restraints**

**Assist), and Corrections Officer Ty Nesberg (Breacher) was assembled and reported to Cell B-102.   Prisoner Peoples was given orders by A/Sgt. Santure to follow all staff direction.  Resident Unit Officer Schertz conducted a complete strip search of prisoner Peoples.  Resident Unit Officer Deatsman, assisted by RUO Perala, applied the lower portion of the hard restraints through the lower slot and the upper portion of the hard restraints through the upper slot.  Corrections Officer Nesberg breached open the cell door and prisoner Peoples stepped out of the cell.  Prisoner Peoples was then escorted to the front of the A-Wing shower stall area where A/Sgt. Santure and RN Bergh checked and approved the restraint application.  At 2001 hours, the move team escorted prisoner Peoples back to the front of Cell  B-102 where RUO Deatsman connected the upper and lower portions of the hard restraints together with a padlock.  Prisoner Peoples was then placed and secured in the cell.**

**Corrections Officer Ken Holman videotaped the entire incident.**

**Corrections Officer Dustin Boyak was assigned to the Birch Unit Bubble at the time of this incident.**

**Prisoner Peoples received Misuse of Property and Disobeying a Direct Order misconducts.**

(ECF No. 214-3, PageID.1434-1436.)

---

[11]   Officer Boyak attests that if the water had contained "sewage or human excrement," all the exposed inmates would have been moved to temporary segregation cells while the contamination was cleaned.  (ECF No. 239-2, PageID.1737.)

In the opinion of the undersigned, three aspects of the June 13 cell removal and subsequent restraint must be assessed in light of the Court of Appeals' direction to analyze this incident under Constitutional prohibitions against cruel and unusual punishment.   The aspects to be analyzed are:   (1) the measures used to remove Peoples from the cell, (2) the use of hard restraints for over 31 hours, and (3) the conditions of Peoples's confinement during that time, in particular, whether the cell contained sewage.

**First**, in the opinion of the undersigned, the force used by the move team was reasonable and justified under the circumstance.   Defendant Bauman, the Warden, approved of forced cell entry, chemical agent and hard restraints (over 2 hours) to extract Peoples and gain control of the situation.   (ECF No. 214-3, PageID.1434.) The Officers believed that Peoples flooded his cell and continued to refuse orders to remove his arm from his door cell slot.   As a result, a move team was called.[12]

In the view of the undersigned, a dispute over the cause of the flooding does not create a genuine issue of material fact.   At the time of the cell removal, Peoples was in segregation in a Level-4 cell.   Nevertheless, as can be seen on the video, he refused to leave his cell and was disruptive.   As a result of Peoples's resistance to orders, a move team was formed.   An Officer then warned Peoples that a chemical

---

[12]     None of the move team Officers were named as Defendants in this case.   Even if Peoples named each member of the move team as a Defendant in this case, excessive force was not used during the June 13, 2011, cell extraction or while applying the restraints.   The minor force that was used, placing Peoples in restraints and assisting him while walking outside his cell can only be characterized as reasonable, routine, and uneventful.

agent had been authorized for his cell removal. This was essentially Peoples's last chance to comply with the order. After the warning, Peoples complied with the orders and allowed the Officers to place him in restraints with little to no resistance. Thus, the move team did not use all of the force authorized by the Warden.

The undersigned concludes that removal of Peoples from his cell and use of hard restraints was justified based on the circumstances, regardless of the cause of the flooding. Peoples was in a level-4 segregation cell. Officers told him to get out of the cell and he refused. Thus, Officers were justified in forming a move team and extracting Peoples. If Peoples did not cause the flooding, as he claims, then he could have left the cell when ordered and allowed a clean-up to take place. But he did not comply with orders, thus necessitating the formation of a cell extraction team.

After the restraints were placed on Peoples, a nurse checked the restraints to ensure that they were not too tight. Peoples was then returned to his cell.

Furthermore, the video depicts conduct by the move team that was professional, reasonable and not abusive. Thus, the undersigned concludes that the evidence before the Court shows that the removal of Peoples from his cell and initial use of hard restraints did not violate the Eighth Amendment prohibitions on use of excessive force and did not subject Peoples to unconstitutional conditions of the confinement.

**Second**, the undersigned concludes that the use of hard restraints for over 31 hours was justified under the circumstances. As noted above, the hard restraints were checked by a nurse as soon as they were applied. (ECF No. 214-3,

PageID.1436.) Peoples claims that he was subjected to inhumane conditions and continuous and excessive force for 31-½ hours after he was placed back into the cell in restraints. Peoples says he was refused a mattress, his restraints were too tight, his cell was flooded, his water was turned off, and he was unable to use the toilet. The records before the Court indicate (1) that Peoples was being monitored by health care staff the entire time he remained in restraints, (2) that Peoples was also monitored by MDOC Corrections Officers during this time, and (3) that Peoples continued to be disruptive and threatening during this period.

Health care staff checked Peoples's health condition and the tightness of the restraints throughout this period. As shown below, nurses checked on Peoples five times while he was confined in restraints. The restraints were properly applied and not too restrictive and Peoples was never in distress. The Clinical Progress Notes for June 13 and 14 are shown below.[13]

**Comments:**
I was initially called by control at 1910 to check the chemical agent risk status of Pt, who was found to be a normal risk. I was already in Birch when Pt was placed into restraints. I checked restraints at 1957, at which time Pt was standing facing the shower door in hard bilateral wrist and ankle restraints, which were in proper position and allowed proper circulation distal to restraints. There was room between restraints and wrists and ankles, and waist chain allowed movement and did not interfere w/respiration, which were even and unlabored. There was no s/s of injury to Pt, pulses were present, skin was warm, no edema present. Pt was calm & cooperative.

**Date:** 06/13/2011
**Time:** 8:33 PM
**User:** Phyllis E. Bergh, RN

---

[13] Defendants' supplemental brief included a certification that the health care records provided by Defendants were records of regularly conducted activity. (ECF No. 239-1, PageID.1733.)

DATE: 06/14/2011 6:48 AM
INMATE ID: 479867

## SOAP NOTE

**Subjective:**
Hey nurse, how long am I going to be here.

**Objective:**
Patient in hard restraints standing at cell door. Nurse checked on patient and asked patient step away from the door so I could do a visual check of his hard restraints. Patient was asked to stand away from the door 3 times and did not comply. Officer standing with me also asked patient to comply with my request but he just said "what for?"

**Assessment:**
Potential for alteration in skin integrity r/t hard restraints.

**Plan:**
Assess hard restraints bid each shift for signs and symptoms of skin breakdown or change in circulation, or any complications that could develop r/t hard retraints.

**Comments:**
Patient sitting on his bunk did not get up and come to the door for the nurse to visually check his restraints, would not answer questions, but in NAD.

**Date:** 06/14/2011
**Time:** 1:34 PM
**User:** Linda D. Solka, RN

**Comments:**
Pt came to door when asked, ambulating w/out difficulty, resp even & unlabored, hard restraints applied properly, hands & feet w/movement, no edema present, circulation distal to restraints normal, Pt in NAD.

**Date:** 06/14/2011
**Time:** 4:45 PM
**User:** Phyllis E. Bergh, RN

**Comments:**
Checked Pt's bilateral wrist & ankle restraints and found all four to be properly fitted to allow proper circulation distal to restraints. Pt was calm, cooperative and in NAD.

**Date:** 06/14/2011
**Time:** 8:24 PM
**User:** Phyllis E. Bergh, RN

(ECF No. 214-8, PageID.1532-1536.)

- 27 -

In addition, to receiving medical care and ensuring that his restraints were properly applied, Peoples admitted during his deposition that he was able to use the toilet in his cell.

> **Q.** So you attempted to use the bathroom but were not able to?
>
> **A. I believe the first time I was able to use the bathroom, and it was just that over time being able to walk back and forth becomes more painful and your ankles get cut and torn up from walking in the restraints that I had just given up on it. It started hurting too much.**
>
> **Q.** How far away is your bunk to the toilet?
>
> **A. About -- in that facility about six, seven feet.**

(ECF No. 214-4, PageID.1447.)

In addition, the Logbook Notes from the period when Peoples was in hard restraints indicate that he was checked regularly by Corrections Officers (COs). These notes indicate that Peoples was removed from his cell at 7:56 PM on June 13. (ECF No. 214-14, PageID.1565; *see also* ECF No. 239-2, PageID.1737 (affidavit of CO Boyak, laying foundation for admission of logbook).)   Thereafter, COs checked Peoples at approximately 15-minute intervals beginning at 8:30 PM (on June 13) and continuing until the end of the day on June 14.   (*Id*. PageID.1565-72.)

Furthermore, Peoples and another prisoner with the last name Emory were threatening and abusive to COs during the period when hard restraints were used. The Logbook documents the following threats by Peoples:

- 1:15 AM on June 14:   A CO reported that Peoples was being threatening.   (*Id.*, PageID.1566.)

- 6:15 AM on June 14:   Peoples and Emory told COs that they are "Batman and Robin" and when they come out of restraints "we're tearing this place up!"   (*Id.*, PageID.1567.)

- 7:09 AM on June 14:   Peoples and Emory "still threatening staff and to destroy cells."   (*Id.*)

- 8:15 AM on June 14:   Emory said, "I'm gonna tear this batcave up," and Peoples added, "I'm with you on that, batman."   (*Id.*, PageID.1568.)

- 10 AM on June 14:   Peoples and Emory are still making threats.   (Id.)

- 1:30 PM on June 14:   Peoples said, "It's not over, I will get even."   (*Id.*, PageID.1569.)

- 2:27 PM on June 14: Peoples said "this shit ain't over."   (*Id.*, PageID.1570.)

- 3:21 PM on June 14:   Peoples and Emory told COs that they will flood and assault staff when they get a chance.   (Id.)

- 7:10 PM on June 14:   Peoples and Emory were still threatening COs and said they would bust out their windows as soon as they get a chance. (*Id.*)

- 10:25 PM on June 14:   Peoples and Emory threatened CO Weinberg. (*Id.*, PageID.1572.)

**Third**, the undersigned concludes that Peoples was not required to stay in a cell containing raw sewage.   The video shows a small part of the floor at the time of the extraction.   The water appears clear.   In addition, in the video, none of the Officers on the move team made any audible comments indicating that raw sewage was on the floor during the cell extraction.   But the video is not the only evidence that the water did not contain sewage.   The records from the June 13 incident indicate that only water was on the floor, and that water was cleaned up quickly by porters.   (*See* ECF No. 214-2, PageID.1565 (showing porters cleaning up flood from 8:17 PM to 9:08 PM).)   The Critical Incident Report associated with this incident makes no mention of raw sewage on the floor.   (ECF No. 214-3, PageID.1434-36.) Also, CO Boyak attested that the water on the floor did not contain sewage.   (ECF No. 239-2, PageID.1737.)   He also attested that additional measures would have been required to clean up the area if sewage had been present.   (ECF No. 239-2, PageID.1738.)   This only makes sense because other prisoners, COs and health care personnel were required to work in this area.   The records reflect that MDOC nurses and COs regularly checked Peoples, and sometimes had physical contact with him in order to check him.   They certainly could not have made those checks in a safe manner if raw sewage were present on the floor of his cell or in the hall.   Moreover, Peoples did not complain about raw sewage in his cell when COs and MDOC nurses were making rounds.   Peoples's claim that his cell was flooded with sewage is not credible given the totality of the circumstances and is insufficient to create a genuine issue of material fact on this point.

Furthermore, contrary to Peoples's assertions, he was able to move around his cell, lay down, sit down and use the toilet.   The Unit Logbook indicates that he still had enough energy to harass and threaten staff despite being confined in hard restraints.   Although the restraints were undoubtedly uncomfortable, Peoples was constantly monitored by medical staff and was never in distress as a result of his conditions of confinement.   In the opinion of the undersigned, Peoples has failed to establish a genuine issue of fact regarding violations of his Eighth Amendment rights during the June 13, 2011 cell extraction and the 31 hours or so that followed.

In addition, the undersigned wishes to comment on the evidence relating to particular Defendants associated with this incident.   Peoples names Defendants Curtis, Rankin, Rondeau, and Lindenmuth for their involvement in the events surrounding the June 13, 2011 incident.   But the evidence indicates that these Defendant did not have direct involvement in the acts that Peoples asserts violated his Eighth Amendment rights.

First, CO Curtis allegedly initially delayed returning a mattress to Peoples before the cell extraction, notified Peoples that an emergency response team was coming to his cell to extract him, and, after the incident, wrote a misconduct ticket for destruction and misuse of property.

Second, Defendants Rankin and Rondeau allegedly gave Peoples misconduct tickets after he was restrained inside his cell for the behavior which necessitated the cell extraction. Furthermore, Defendant Curtis, Rankin, and Rondeau did not use any force, were not part of the move team, did not place Peoples in restraints, and took no

action that could have violated Peoples's Eighth Amendment rights. Although Peoples alleges that Defendants Curtis, Rankin, and Rondeau were complicit in allowing him to be restrained in his cell and refusing to take action when he complained that his restraints were too tight, Peoples was being monitored closely by health care staff while he was restrained in his cell. Defendants Curtis, Rankin, and Rondeau only delivered Peoples misconduct tickets due to his misbehavior and failure to follow orders.

Third, Defendant Lindenmuth visited Peoples before the cell extraction, and allegedly ordered Defendant Curtis and another Officer to place the mattress in the cell. Defendant Lindenmuth did not violate Peoples's Eighth Amendment rights by making sure that Peoples *had* a mattress. Lindenmuth was not involved in the cell extraction or the placement of Peoples in restraints.

In summary, the video of the extraction and use of hard restraints, the medical records, the Unit Logbook and the attestation of CO Boyak paint a clear picture of what happened on June 13 and 14: Peoples was being disruptive and, regardless of the reason, refused orders to leave his cell. This caused Officers to form a move team. Peoples then complied with orders and was placed in restraints. But, after he was placed in restraints, Peoples was threatening and abusive to staff. Given these circumstances, the Defendants involved in the June 13-14, 2011 incident did not violate Peoples's Eighth Amendment rights. Accordingly, in the opinion of the undersigned, Peoples has failed to show that his Eighth Amendment rights were violated on June 13 or 14, 2011, by any of the named Defendants.

- 32 -

### 2.  The August 8, 2011, incident

The video of the incident on August 8, 2011 shows that Peoples had covered his cell door window with paper and barricaded the door with his mattress, while being disruptive.   Peoples was told to remove the paper from his cell door window. The video shows that Peoples refused multiple orders to remove the paper even after he was warned that a chemical agent, authorized by Defendant Deputy Warden Lesatz, would be used to facilitate his removal.   As a result, Officers opened the food slot and used a device to push the mattress away from the door.   A chemical agent – Fox Labs Fogger (ECF No. 234-2, PageID.1717) – was sprayed into the cell.   Peoples continued to refuse orders to remove the paper from his window.   After several minutes, Peoples removed his mattress from the door and the paper from his cell door window, and complied with orders to be restrained.   Peoples stated that he could not breathe.   An Officer told him to hurry up and take his clothes off and they would get him out of the cell.   The Officers conducted a quick strip search and provided Peoples with clothing.   Peoples was restrained through the food slots on his cell door without incident.   Peoples appeared subdued immediately after he was removed from his cell.   An Officer asked if Peoples wanted to see health care and he responded that he did.   The Officers walked Peoples backward to a location outside the building.

Once Peoples was taken outside, he was provided with eyedrops by Defendant Nurse Scott.   Defendant Scott also checked the restraints. Peoples remained outside for several minutes and appeared to calm down and breathe without issue.   Peoples was then moved to a new cell.

When he arrived outside his new cell, he requested a shower to wash off the "mace" saying he was covered with "mace" and he wanted a shower.   The restraints were tightened to place him in a position that required him to bend his knees so that he was in a crouching position.   As his belly chain was tightened, Peoples become argumentative and resisted the Officers attempts to tighten the chain to place Peoples in a crouching position.   Peoples was secured in restraints in a slight crouching position.   Peoples then entered his new cell.   The video shows that Peoples could stand while inside his cell.   The video shows that once Peoples entered his cell and the door was closed, he stood at his cell door window while he complained to the Officers.

The Critical Incident Report describes the August 8, 2011, cell extraction. Attached below is a portion of that report:

At 1246 hours, prisoner Peoples #479867 (Cell B-102) was ordered by Sergeant Terry Kienitz to come to the cell door in order to be moved from his cell to Cell B-144 by the move team.  A move team supervised by Sgt. Kienitz and consisting of Resident Unit Officers Robert Wickstrom (Restraints), Steve McDonnald (Assist), Dave Tennyson (Breacher), Corrections Officers Dan Stasewich (Video Camera), and Mike Sadak (Shield), was there because prisoner Peoples had refused to be removed by unit staff, covered his cell door window with paper, covered his back cell door window with his state mattress, and attempted to start a fire in his cell using paper and his cell outlet.  Deputy Warden Daniel Lesatz authorized forced cell entry, the use of chemical agents, and

the use of soft restraints (over two hours if necessary) to control prisoner Peoples' disruptive behavior.  Health Services was contacted and Registered Nurse Gail Staley classified prisoner Peoples #479867 as normal risk for chemical agent use.  Corrections Officer Sadak gave prisoner Peoples several orders to uncover his cell door window and come to the door to be restrained.  Prisoner Peoples refused all orders given.  Sergeant Kienitz then gave prisoner Peoples several orders to uncover his window.  Prisoner Peoples then placed his state mattress up against the cell door.  Sergeant Kienitz gave several orders to remove the mattress and uncover the cell door window or chemical agent would be used.  Prisoner Peoples refused all orders and made several statements confirming that he heard all orders given to him.  Corrections Officer Tennyson opened the upper cell door slot and RUO's McDonnald and Wickstrom used the depresser to push the mattress away from the door.  Sergeant Kienitz then administered Fox 5.3 chemical agent into the cell at 1246 hours.  After a short period of time, prisoner Peoples removed the paper and mattress from in front of his cell door and complied with a strip search by C/O Sadak.  Resident Unit Officer Wickstrom applied the upper portion of the soft restraints through the upper cell door slot and the lower portion of the soft restraints through the lower cell door slot.  The move team then escorted prisoner Peoples to the commons area of Birch Unit where Registered Nurse Charlie Scott flushed out prisoner Peoples' eyes.  Prisoner Peoples was then escorted to Cell B-144 where RUO Wickstrom attempted to connect the upper and lower portions of the soft restraints.  Prisoner Peoples refused several orders by the move team to bend his knees and was attempting to manipulate the proper application of the restraints.  As the move team attempted to bend prisoner People's knees, he became disruptive and uncooperative.  Sergeant Kienitz directed the move team to place prisoner Peoples against the door to gain better control.  Corrections Officer Wickstrom was then able to connect the upper and lower portions of the soft restraints.  Sergeant Kienitz and RN Scott checked and approved the proper restraint application.  Prisoner Peoples was then secured by in Cell 144 by the move team.

Corrections Officer Kris Petosky was assigned to the Birch Unit Bubble during this incident.

(ECF No. 214-3, PageID.1437-1439.)

As noted above, during oral argument on May 17, 2019, Peoples acknowledged that the use of chemical agent during the removal on August 8, 2011, and the initial use of soft restraints immediately after were justified.   The undersigned agrees that the chemical agent was necessary to remove Peoples from his cell because he was refusing orders and barricading the door with a mattress and paper.   Furthermore, the use of soft restraints immediately after the extraction was justified to restrain an unruly prisoner.   Thus, the actions of Defendant Lesatz in authorizing the use of the chemical agent, and the actions of Defendants Kienitz, Wickstrom, McDonnald, Tennyson, and Sadak in removing Peoples from his cell by using a chemical agent, and the subsequent use of restraints did not violate Peoples's Eighth Amendment rights.

The incident did not end there though.   Peoples was restrained in soft restraints for several more days and remained in the same clothes he was wearing at the time of the cell extraction.   As a result – and as directed by the Court of Appeals – this Court must consider several other aspects of the incident.   Specifically, the Court must assess the following:   (1) whether the continued restraint of Peoples was justified, (2) whether Peoples experienced an extreme level of pain and suffering as a result of unconstitutional conduct, and told MDOC officials about this, (3) whether Peoples was denied a mattress and other bedding at times during which it was very cold, in violation of the Eighth Amendment, (4) whether Defendants Bauman, Lesatz, and Sprader were aware through various prison documents, of a history at LMF of using restraints and mace as a means to inflict punishment, (5) whether Nurse Scott denied Peoples an opportunity to clean "mace" off his body, in violation of the Eighth Amendment, (6) whether the combined effects of the soft restraints and the alleged "mace" violated the Eighth Amendment, and (7) whether Peoples experienced conditions of confinement that violated the Eighth Amendment.

The records before the Court – primarily information regarding the chemical agent used, the Unit Logbook, Peoples's medical records, and Peoples's own statements – address all of these issues.

**First**, the undersigned will address the chemical agent used and its impact. Peoples has repeatedly referred to the chemical agent in this case as "mace."   Peoples says that he was not allowed to wash the mace from his body after it was sprayed

directly at him.   And he says this contributes to the unconstitutionality of Defendants' action.

The chemical agent used to extract Peoples from his cell was Fox Labs Fogger, which MDOC uses for all cell extractions.   (ECF No. 234-2, PageID.1716-1718 (affidavit of Richard Tischer).)   The Fogger releases a mist and not a liquid stream. (*Id*.)   The Fogger is designed to contaminate an entire cell thus coming into contact the eyes and respiratory system of occupants of the cell, resulting in eye irritation and shortness of breath.   (*Id*.; ECF No. 234-1, PageID.1708.)   The result of skin contact is frost-bite, not skin irritation.   (ECF No. 234-1, PageID.1708.)

The procedure for decontamination involves removing the inmate from cell to a noncontaminated area and flushing his eyes out with water or eye drops.   ECF No. 234-2, PageID.1716-1718.)   After the inmate receives eye drops and is breathing freely, he is taken to an uncontaminated cell.   (*Id*.)   A portion of the Fox Labs Fogger Safety Data Sheet regarding first aid after exposure is attached below:

| SECTION 4: First aid measures | |
|---|---|
| **4.1.**   **Description of first aid measures** | |
| First-aid measures general | : Never give anything by mouth to an unconscious person. If you feel unwell, seek medical advice (show the label where possible). |
| First-aid measures after inhalation | : Remove victim to fresh air and keep at rest in a position comfortable for breathing. If breathing is difficult, give oxygen. If not breathing, give artificial respiration.  Call a POISON CENTER or doctor/physician if you feel unwell. |
| First-aid measures after skin contact | : In case of contact with liquid, thaw frosted parts with water, remove clothing carefully and wash with soap & water. Do not apply salves or creams to affected area. If skin irritation persists, seek medical attention. |
| First-aid measures after eye contact | : Rinse immediately and thoroughly, pulling the eyelids well away from the eye (15 minutes minimum). Remove contact lenses, if present and easy to do. Continue rinsing. If eye irritation persists: Get medical advice/attention. |
| First-aid measures after ingestion | : Rinse mouth. Do NOT induce vomiting. If the person is fully conscious, make him/her drink water. Never give an unconscious person anything to drink. Contact the Poison Control Centre at 1-800-222-1222. |
| **4.2.**   **Most important symptoms and effects, both acute and delayed** | |
| Symptoms/injuries after inhalation | : Shortness of breath. |
| Symptoms/injuries after eye contact | : Causes serious eye irritation. |
| Symptoms/injuries after skin contact | : May cause frost-bite. |
| Symptoms/injuries after ingestion | : May cause irritation to mouth, throat and stomach upon direct contact. |
| **4.3.**   **Indication of any immediate medical attention and special treatment needed** | |

(ECF No. 234-1, PageID.1708.)

Thus, Fox Labs Fogger will not cause the long-term skin irritation that Peoples claims.

In addition, as shown in the video, MDOC officials followed approved decontamination procedures. Peoples was removed from his cell after the chemical agent was disbursed and he was immediately taken outdoors. Defendant nurse Scott flushed Peoples's eyes with a solution and checked his restraints. Peoples began to breathe more freely and began to speak with the Officers and complain about being extracted from his cell. Peoples was then escorted to a different cell.

**Second**, the duration of the restraint appears to be justified under the circumstances. At the start of this incident Peoples, by his own admission, was "trying to cause chaos." (ECF No. 214-4, PageID1448.) The Unit Logbook indicates that Peoples continued this approach by making threatening and abusive statements to MDOC officials throughout the day on August 8, 2011. The Logbook documents the following threats by Peoples:

- 2:03 PM on August 8: Peoples said, "good, 2-10 shift is here. I get to fuck with you now." (ECF No. 214-7, PageID.1509.)

- 3:31 PM on August 8: Peoples was threatening to "stick" RUO Kurth. (*Id*.)

- 7 PM on August 8: Peoples said, "It's not over bitch. I'm gonna stick your bitch ass as soon as I get out of restraints." (*Id*., PageID.1510.)

- 9:11 PM on August 8:  Peoples remains aggressive towards staff.  (*Id.*, PageID.1510.)

- 10:30 PM on August 8:  Peoples told CO Vining, "it will be your bitch ass."  (*Id.*, PageID.1511.)

- 11:41 PM on August 8:  Peoples told staff that he was not done with his actions.  (*Id.*)

- 12:00 AM on August 9:  Peoples said, "when I get out of these restraints, I'm gonna burn this bitch ass place down."  (*Id.*)

Defendants did not provide Logbook notes for the following days.  But, Peoples's threatening behavior after he was placed in restraints, which mirrored threatening behavior from the earlier incidents, indicates that continued use of restraints was justified.

Peoples insists that he was compliant with MDOC officials and that the continued use of restraints was not justified.  But, as he admitted, his intent was to cause "chaos" (ECF No. 214-4, PageID1448), and, as outlined above, he repeatedly threatened MDOC after the cell extractions on June 13 and August 8.  His claim that he was compliant is simply not credible.

**Third**, during the period when Peoples was in soft restraints, Corrections Officers and MDOC medical staff regularly checked on Peoples's condition.  Peoples admitted during his deposition that Officers checked on him every 15 minutes while he was in restraints.  (ECF No. 214-6, PageID.148.)  In addition, Peoples was regularly monitored by health care staff while he was confined in restraints in the

new cell.   The medical records show that while Peoples remained in restraints he was checked by medical staff 18 times.    (ECF No. 214-8, PageID.1513-1531.) Portions of some of records are shown below.   These records begin with a nurse's report from August 8 at 3:15 PM and continue through the last nurse's report on August 10 at 1:31 PM.

PATIENT:                        EDISON PEOPLES
DATE OF BIRTH:          ███████
DATE:                            08/08/2011 3:15 PM
INMATE ID:                   479867

----

### SOAP NOTE

**Subjective:**
yeah

**Objective:**
Chem agent was used on pt. Pt eyes rinsed out with eye wash per pt request. restraints move on all extremities, color and resp even, breathing unlabored. no complaints voiced

**Assessment:**
pot for injury r/t restraints

**Plan:**
cont to check 2 times per shift

**Provider: Amy  Westcomb, PA**

**Document generated by: Charles D. Scott, RN**

(*Id.*, PageID.1530.)

PATIENT:                     EDISON PEOPLES
DATE OF BIRTH:
DATE:                        08/08/2011 20:30
INMATE ID:                   479867

## SOAP NOTE

**Subjective:**
Restraint Check Myt fingers feel funny.

**Objective:**
Both hands warm to the touch. Movement of hands and feet within normal limits. Hands with good venous filling ans emptying. Cap refill less than 2 seconds. BNo0 complaints of ankle cuffs being tigh. Walks without difficulty.

**Assessment:**
Restraint check.

**Plan:**
Will continue to minitor twice per shift.

**Provider: Aster Berhane, MD**

**Document generated by: David J. Kihm, RN**

(*Id.*, PageID.1529.)

PATIENT:                     EDISON PEOPLES
DATE OF BIRTH:
DATE:                        08/09/2011 1:39 PM
INMATE ID:                   479867

## SOAP NOTE

**Subjective:**
Late entry for 8/8/11 No I'm not alright

**Objective:**
Patient laying on bunk, got up off bunk and walked to the door without any difficulty, upset that he is in restraints. Patient alert and oriented, states that the nurse washed his eyes out.
No swelling or reddness noted hands or feet, amb without difficulty, able to eat and use the bathroom

**Assessment:**
Potential for altered skin integrity r/t wrist and ankle soft restraints.

**Plan:**
Continue 2 x shift restraint check.

**Provider: Amy Westcomb, PA**

**Document generated by: Linda D. Solka, RN**

(*Id.*, PageID.1526.)

- 41 -

PATIENT:              EDISON PEOPLES
DATE OF BIRTH:        █████████████
DATE:                 08/09/2011 1:49 PM
INMATE ID:            479867

## SOAP NOTE

**Subjective:**
How long this gonna go on,  I can't do nothing

**Objective:**
Patient showed me his hands and wrists, ankles, no sore, bruising or reddness noted, patient able to amb about the cell and use the toilet without difficulty.  Patient able to eat and drink without difficulty

**Assessment:**
Potential for altered skin integrity r/t soft restraints.

**Plan:**
Continue to monitor soft restraints 2x shift.

**Provider: Amy  Westcomb, PA**

**Document generated by: Linda D. Solka, RN**

(*Id.*, PageID.1525.)

PATIENT:              EDISON PEOPLES
DATE OF BIRTH:        █████████████
DATE:                 08/09/2011 4:44 PM
INMATE ID:            479867

## SOAP NOTE

**Subjective:**
This one (R wrist restraint) is bugging me. Ya, I can move my fingers.

**Objective:**
Pt laying on bunk, got up and ambulated to door window, speech clear, A & O, ambulation wnl, normal color & movement in extremeties, soft restraints properly applied to wrists & ankles bilaterly.

**Assessment:**
alt in comfort r/t restraints

**Plan:**
continue twice per shift restraint checks

**Provider: Amy  Westcomb, PA**

**Document generated by: Phyllis E. Bergh, RN**

(*Id.*, PageID.1522.)

PATIENT:                  EDISON PEOPLES
DATE OF BIRTH:
DATE:                     08/09/2011 8:54 PM
INMATE ID:                479867

## SOAP NOTE

**Subjective:**
I finally got a blanket, but my back hurts from laying on this hard bunk.

**Objective:**
Pt got up from bunk to stand at door window, resp even & unlabored, Pt A & O, Pt able to move upper & lower extremeties,  color of extremeties wnl, Pt in NAD at this time.

**Assessment:**
alt in comfort r/t  restraint use

**Plan:**
continue w/ twice per shift restraint checks until removed.

**Provider: Amy  Westcomb, PA**

**Document generated by: Phyllis E. Bergh, RN**


(*Id.*, PageID.1521.)


PATIENT:                  EDISON PEOPLES
DATE OF BIRTH:
DATE:                     08/09/2011 10:56 PM
INMATE ID:                479867

## SOAP NOTE

**Subjective:**
I'm doing OK my back is killing me from laying on this rock. They finally gave me a blanket to lay on. My hands and feet are OK but could you get me my Naproxen I've got it ordered for my back but no one will give it to me it's in my propp[erly.

**Objective:**
Was sitting on his bunk area. Got up and walked to cell door without difficulty. Placed hands through food slot one at a time. both were warm to the touch. Capilary refill les than 2 second. Palpable radial and ulnar pulse bilaterally. Veins dorsum of hands empty with light compression and quickly refill. Feet bilaterally pink and without weakness when walking. No complaints other than his chronic back pain. verbalized. A & O. Respirations easy no bifficulty normal conversation.

**Assessment:**
Restraint check.

**Plan:**
Will recheck in approx 4 hours. Naprosyn 375 mg obtained from HC stock and delivered to patient. Was most appreciative.

**Provider: Aster  Berhane, MD**

**Document generated by: David J. Kihm, RN**

(*Id.*, PageID.1520.

| PATIENT: | EDISON PEOPLES |
| DATE OF BIRTH: | ████████ |
| DATE: | 08/10/2011 2:39 AM |
| INMATE ID: | 479867 |

### SOAP NOTE

**Subjective:**
I'm doing OK. Getting a little sleep tonight. That Naproxen helped my back.

**Objective:**
Awoke for restraint check. Walked without difficulty to cell door. Hand warm with pinkish coloration. Nail bed pink with good capilary refill. <2 seconds. Viens dorsum of hand easily compressed with rapid refill. Feet pink. Walks without difficulty.

**Assessment:**
Restraint check.

**Plan:**
Will continue restraint checks twice per shift.

**Provider: Aster  Berhane, MD**

**Document generated by: David J. Kihm, RN**

(*Id.*, PageID.1519.)

PATIENT:                        EDISON PEOPLES
DATE OF BIRTH:                  ████████
DATE:                           08/10/2011 1:31 PM
INMATE ID:                      479867

---

### Clinical Progress Note

**Comments:**
Patient continues to be in restraints, NAD, standing at cell door talking with other prisoners, showed me his
restraints, able to move about cell and eat and drink fluids, use the toilet. Patient continues to be upset about
being in restraints. Alert and oriented answers questions without hesitation. No reddness or skin breakdown
noted extremeties

**Date:** 08/10/2011
**Time:** 1:32 PM
**User:** Linda D. Solka, RN

**Comments:**
0800 restraint check, patient alert and oriented standing at cell door, has already eaten, upset about being in
restraints. NAD, able to move about the cell without difficulty. No reddness or skin breakdown noted extremeties.

**Date:** 08/10/2011
**Time:** 1:34 PM
**User:** Linda D. Solka, RN

**Provider: Amy  Westcomb, PA**

**Document generated by: Linda D. Solka, RN**

(*Id.*, PageID.1518.)

PATIENT:                        EDISON PEOPLES
DATE OF BIRTH:                  ████████
DATE:                           08/11/2011 10:37 AM
INMATE ID:                      479867

---

### SOAP NOTE

**Subjective:**
---

**Objective:**
pt asleep and in NAD, resp even, color even, breathing unlabored. restraints visible x 4 with ample space noted.
No compromise to circulation noted

**Assessment:**
pot for injury r/t restraints

**Plan:**
cont to monitor

**Provider: Amy  Westcomb, PA**

**Document generated by: Charles D. Scott, RN**

(*Id.*, PageID.1515.)

The restraints were removed on August 11, 2011, at 1:19 PM.   (*Id.*, PageID.1513.)

The medical records establish that Peoples was able to ambulate without difficulty, walk in his cell, sit, lie down, eat, drink, sleep, and use the toilet.   Peoples was able to breathe freely.   In addition, after he was removed from the contaminated cell, he was no longer suffering from the negative effects of the chemical agent that had been disbursed into his old cell.   While he did not have a mattress, he was given a blanket after his first night in the new cell.   In addition, the records indicate that Peoples was not complaining about skin irritation or asking medical personnel to help him clean off "mace" that was burning his skin.   Medical personnel were attempting to monitor Peoples's well-being while he was in soft restraints.   The medical records establish that when nurses came to Peoples's cell to check his restraints and condition, he complained about back pain and requested pain medication for soreness caused by the restraints, but he never requested assistance in cleaning the chemical agent off his body.   His silence on the issue of the chemical agent indicates that he was not suffering skin irritation.

Under the circumstances of this case – where Peoples was exhibiting escalating misbehavior by refusing to comply with orders, covering his cell window with paper, barricading his cell door with his mattress – the Defendants were faced with few choices to force compliance with orders and de-escalate the behavior.   Under such circumstances, the use of a chemical agent and force is sometimes necessary.   As the Sixth Circuit explained:

> When an order is given to an inmate there are only so many choices available to the correctional officer.   If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force.   While experts who testified on behalf of the plaintiffs suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.

*Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984).

From Peoples's perspective, the conditions in his new cell were less than ideal. Peoples was uncomfortable and the restraints caused some soreness.   However, he was constantly monitored by Corrections Officers and medical staff who checked the restraints and his medical condition.   Peoples was not subjected to "malicious and sadistic" force, but was subjected to a reasonable amount of force necessary to gain his compliance with orders and to de-escalate his misbehavior.

The conditions resulting from the combined effects of the chemical agent, restraints, denial of a mattress, and bedding (for at least one day) were not deliberately indifferent to Peoples's health and safety and did not create unconstitutional conditions of confinement.   The well-documented medical records, created by medical staff entrusted to monitor Peoples while he was in restraints, establish that Peoples was able to walk in his cell, that he had access to water and that he was able to use the toilet without difficulty.   Peoples also could sit, lay down, sleep, and eat without difficulty.   His restraints were regularly checked by medical personnel and he was closely monitored by Corrections Officers and medical staff.

In the opinion of the undersigned, Peoples fails to support his Eighth Amendment claims that he was subjected to malicious and sadistic excessive force or conditions of confinement that deprived him minimal life necessities, or that any of the defendants acted with deliberate indifference to his safety or medical needs.

Peoples made a generalized allegation that Defendants Lesatz, Sprader, Bauman, Taskila, Smith, Lee, Hursh, Hood, Johnson, O'Dell, and Immel were each aware from "critical incident reports, . . . video footage, . . . prisoner grievances, . . . staff complaints, . . ., other similar documents, . . ., and personal observation" that restraints, chemical agents, and other forms of restrictive conditions of confinement were used for punishment and not for legitimate penological purposes.   (*Id.*, PageID.178-179.)   Peoples has failed to support that claim.   The evidence presented in this case contradicts this assertion.   The critical incident reports, video footage, logbooks, medical records, and Plaintiff's deposition transcript, establish that the staff at Alger Correctional Facility use only the minimum force necessary to deescalate prisoner misconduct.   For these reasons, I respectfully recommend that the Court dismiss Peoples claims arising out of his August 2011 cell extraction.

### VII.   Qualified Immunity

As an alternative argument, Defendants move to dismiss People's damages claims by asserting qualified immunity from liability.   "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir.2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006).

"A right is 'clearly established' for qualified immunity purposes if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001)). The inquiry whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156; *see also Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S. Ct. 2012, 2023 (2014) (directing courts "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced") (internal quotation marks and citations omitted). Thus, the doctrine of qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Humphrey*, 482 F.3d at 847 (internal quotation marks omitted).

"The relevant inquiry is whether existing precedent placed the conclusion" that the defendant violated the plaintiff's rights "in these circumstances 'beyond debate.'"

*Mullenix v. Luna*, 36 S.Ct. 305, 309 (2015), citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In the undersigned's opinion Defendants are entitled to the defense of qualified immunity from liability.

Defendant Bauman authorized the use of force, chemical agent and hard restraints for the June 2011 cell extraction after Peoples was observed flooding his cell and refusing to comply with orders to remove his arm from the door cell slot. Defendant Bauman could not have violated clearly established law under the Eighth Amendment by authorizing the use of a chemical agent under those circumstances.

Defendants Curtis, Rankin, and Rondeau came to Peoples cell to deliver misconduct tickets after he was inside wearing restraints.   Peoples says that these Defendants were complicit in allowing him to be restrained in the cell and denying him a mattress and bedding.   However, Peoples's condition was being regularly monitored by health care staff.   Nurses checked his medical condition and his restraints during the 30-½ hours he was confined inside his cell with restraints. Defendants Curtis, Rankin, and Rondeau could not have violated Peoples's clearly established Eighth Amendment rights under these circumstances.   Similarly, Defendant Lindenmuth's only involvement occurred before Peoples was extracted from his cell and placed in restraints.   Defendant Lindenmuth ordered Officer Curtis and another Officer to provide Peoples a mattress.   Accordingly, Defendant Lindenmuth could not have violated clearly established Eighth Amendment rights.

Defendant Lesatz authorized the use of a chemical agent to extract Peoples from his cell during the August 2011 incident.   Under the circumstances, where

Peoples covered his cell window with paper, barricaded his door with his mattress, attempted to start a fire in his cell, and was being disruptive, the authorization of a chemical agent could not have violated clearly established Eighth Amendment rights.

Defendants Kienitz, Wickstrom, McDonnald, Tennyson, and Sadak were part of the move team that extracted Peoples from his cell, placed him in restraints, and moved him to his new cell on August 8. The amount of force used by the move team was the minimum amount of force necessary to remove Peoples from his cell. Peoples refused numerous orders to take down the paper from his cell window, remove the mattress from his cell and come to the front the of cell so that restraints could be applied. The Defendants were left with no choice but to use the chemical agent. Even after the chemical agent was disbursed, Peoples remained noncompliant until the chemical agent caused him to have difficulty breathing. The Defendants took Peoples outside in the fresh air and Defendant nurse Scott, used eye drops to rinse Peoples's eyes before checking the restraints. After several minutes passed, the Officers moved Peoples inside to a new uncontaminated cell. Peoples was not having difficulty breathing and appeared to be able to move around in restraints. Medical staff confirmed that the restraints did not cause medical concerns, were applied appropriately, and that Peoples could walk, sit, lie down, sleep, eat, drink, and use the toilet without difficulty during the entire time that he remained in restraints. In the opinion of the undersigned, Defendants Kienitz, Wickstrom, McDonnald, Tennyson, Sadak, and Scott did not violate clearly established Eighth Amendment rights through any of their actions.

As previously stated, Peoples was being closely monitored by prison staff and medical staff while he was restrained in August of 2011.   Medical staff confirmed that Peoples could ambulate, eat, drink, sleep, lay down, and use the toilet without difficulty.   For these reasons, Defendants Hursh, Hood, Taskila, Smith, Immel, O'Dell, Lee, Johnson, and Branus, who each allegedly visited Peoples while he was in restraints could not have violated clearly established Eighth Amendment rights after Peoples allegedly complained about his restraints and the conditions in his cell.

Defendants Lesatz, Sprader, Bauman, Taskila, Smith, Lee, Hursh, Hood, Johnson, O'Dell, and Immel are each entitled to qualified immunity on Peoples claim that they should have known from historic documents at the Alger Correctional Facility that chemical agents and restraints are used to punish prisoners and serve no legitimate penological interest.   As previously explained, Peoples allegations are unsupported.   The evidence establishes that there was a legit penological justification for the use of chemical agents and restraints in this case.   The critical incident reports, video footage, logbooks, medical records, and deposition transcripts show that the chemical agent and restraints were properly used to deescalate an increasing level of misbehavior.

## VII.   State Law Claims

Peoples makes several state law claims including assault, battery, negligence, gross negligence, and professional negligence.   (ECF No. 242, PageID.1747.) Claims under § 1983 can only be brought for "deprivation of rights secured by the constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S.

922, 924 (1982).   Peoples, however, seeks to invoke this Court's supplemental jurisdiction over state-law claims.   In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."   *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).   Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.   *Id.*   Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). It is respectfully recommended that the Court decline to exercise supplemental jurisdiction over the state law claims.

## VIII.   Recommendation

It is respectfully recommended that the Court grant Defendants' motion for summary judgment.   (ECF No. 213.)

In making this recommendation, I understand that Peoples was uncomfortable during and after the June and August cell extractions.   Peoples believes that Defendants went too far by giving him restrictions inside his cell while he was restrained, and by using a chemical agent without giving him a shower.   The facts in the record, however, show that Peoples put the Defendants in a difficult position during the summer of 2011.   On multiple occasions he harassed Officers, refused

orders, and caused continued disruption by barricading his cell door with his mattress, covering his cell door window with paper, flooding his cell, and attempting to start a fire in his cell. The Officers were left with little choice but to take some action.

In the opinion of the undersigned, Defendants used only the minimal amount of force necessary to complete each cell extraction. Further, Defendants insured that Peoples was appropriately cared for by medical staff when he remained in restraints and was subjected to the other restrictions imposed. Peoples showed that he was uncomfortable and suffered from soreness, but the conditions and force used did not violate Eighth Amendment standards.

I respectfully recommend that the Court find that the combined actions of Defendants in June and August of 2011, did not subject Peoples to unnecessary force and inhumane conditions of confinement in violation of the Eighth Amendment.

If the Court accepts this recommendation this case will be dismissed. NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:     February 26, 2020                    /s/ *Maarten Vermaat*
                                                MAARTEN VERMAAT
                                                U.S. MAGISTRATE JUDGE